## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS
### Eastern Division

| | |
|---|---|
| **TIMEPAYMENT CORP.,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| **v.** ) | Case No. _____ |
| ) | |
| **ADVANCED GLOBAL GROUP LLC,** ) | |
| **JOSE C. ISLA, and** ) | |
| **ISLANDS ENTERPRISES LLC,** ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

TimePayment Corp. ("TimePayment"), by counsel, states the following for its Complaint against Advanced Global Group LLC ("Advanced"), Jose C. Isla ("Isla"), and Islands Enterprises LLC ("Islands Enterprises") (collectively, "Defendants" or "RICO Enterprise"). TimePayment states as follows in support of its claims against the Defendants.

## INTRODUCTION

1.     TimePayment provides lease financing to customers looking to secure equipment for their businesses. It arranges that financing through approved equipment vendors. Until recently, Advanced was one of TimePayment's approved vendors.

2.     Advanced sells equipment and merchant services to small business customers. Isla is its owner, President, and salesman. He has direct contact with Advanced's business customers and helps apply for and secure financing for equipment on their behalf. Advanced's contract with TimePayment was supposed to work as follows.

3.     If Advanced identified a business interested in its equipment but in need of financing, the customer would complete a lease application and Advanced would submit the application for an equipment lease between the customer and TimePayment. That lease application

process included customary credit information, personal information about the customer, and details on the equipment to be subject to the lease.

4.     If TimePayment approved the lease application, Advanced was responsible for arranging the customer's signature on the lease and perhaps most importantly, the customer's bank account information on the method of payment form. Advanced would then submit to TimePayment the signed lease and an invoice for the equipment subject to the lease. TimePayment would pay Advanced a lump sum and take title to the subject equipment.

5.     At that point, TimePayment would have a binding lease with Advanced's customer (the "Lessee") and would make monthly withdrawals of lease payments from the Lessee's bank account that the customer provided and Advanced submitted in the initial Lease Application. That is how the arrangement was *supposed* to work.

6.     In reality, Isla, Advanced, and another Isla-controlled company, Islands Enterprises, combined in a pattern of racketeering activity beginning in November 2022 and continuing until at least May 2024. That activity included predicate acts under the Federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), including mail fraud, wire fraud, and money laundering.

7.     Isla acted as Advanced's salesman and repeatedly misled customers into providing their personal and bank information, which he needed to complete lease applications that Advanced then submitted to TimePayment. Isla falsely told some that the equipment was free. He falsely told others that the lease was not binding or was cancelable at any time. In other cases, Isla, acting as Advanced's salesman and representative, received a customer's consent to submit one lease, but submitted multiple leases in the customer's name.

8.     Unbeknownst to TimePayment until recently, Advanced's lease applications, leases, and equipment invoices to TimePayment—which Isla completed and Advanced

submitted—were riddled with false information. These materials often identified different equipment than what Advanced delivered to the customer. Indeed, on some occasions, Advanced submitted an invoice and lease for the equipment to TimePayment and received payment for the equipment from TimePayment but provided nothing at all to the customer. Advanced also submitted multiple leases for customers who had not agreed to those multiple leases, or who had not agreed to any leases at all.

9.     Isla and Advanced also repeatedly listed bank accounts as the payment source on leases that they knew were not tied to the business named on the lease. As detailed below, this was part of a bank account shell game that the RICO Enterprise used to perpetrate and conceal its illegal activities. Islands Enterprises was a crucial part of this bank account shell game, as explained below.

10.    None of this was by accident or mistake. By increasing the number of leases, Isla increased the amount of equipment payments Advanced could squeeze from TimePayment. Upon information and belief, Isla then caused Advanced to transfer some or all of these ill-gotten profits to Islands Enterprises, and potentially to other entities associated with Isla.

11.    Some of Advanced's customers began to realize that Isla had signed them up for leases with TimePayment that they never agreed to once TimePayment began withdrawing money from their accounts. When they complained to Isla, he attempted to mollify them by making hush money payments for their silence. TimePayment has evidence that Isla used Islands Enterprises to make at least one of these hush money payments.

12.    Between November 2022 and May 2024, TimePayment paid Advanced over $2.5 million for equipment subject to 392 leases originated by Advanced. However, TimePayment has now discovered that **at least** 314 of those leases were fraudulent. As described above and detailed

below, those fraudulent leases were obtained and maintained through a pattern of racketeering activity.

13.     The actions alleged above also materially breached the Vendor Agreement that Advanced entered into with TimePayment in numerous ways. *See* Vendor Agreement, attached as **Exhibit A**.

14.     TimePayment paid Advanced at least $2,120,808.33 in connection with those 314 fraudulent Leases. It now seeks damages under the Federal RICO Act from Defendants and damages due to the breach of the contract by Advanced and Isla.

## PARTIES

15.     TimePayment is a Delaware corporation with its principal place of business at 200 Summit Drive, Suite 100, Burlington, Massachusetts 01803.

16.     Jose C. Isla is a resident of Boca Raton, Florida. During the time periods relevant to the claims in this Complaint, he was the President of Advanced and the managing member and registered agent of Islands Enterprises.

17.     Advanced Global Group LLC is a Florida limited liability company with its principal place of business at 7777 Glades Road, Suite 100, Boca Raton, Florida 33434. Isla is the President and alter ego of Advanced and the mastermind of the RICO Enterprise.

18.     Islands Enterprises LLC was a Florida limited liability company with its principal place of business at 12717 West Sunrise Boulevard, Suite 127, Sunrise, Florida 33323. Isla was Islands Enterprises' managing member and registered agent.

## JURISDICTION AND VENUE

19.     Because TimePayment brings a claim under the federal Racketeering Influenced and Corrupt Organization Act ("RICO") (18 U.S.C. § 1961, *et seq*.), this Court has subject matter jurisdiction under 28 U.S.C. § 1331.

20.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between TimePayment and the Defendants, and the amount in controversy exceeds $75,000.00.

21.     This Court has personal jurisdiction over Defendants pursuant to the forum selection clause contained in  the Vendor Agreement with TimePayment and 18 U.S.C. § 1965. Exh. A, ¶ 23. Furthermore, Defendants purposefully directed the fraudulent and false lease applications, financial information, and equipment invoices underlying the RICO and breach of contract claims to TimePayment in Massachusetts, with the intent of extracting improper payments from TimePayment that they knew would originate from Massachusetts.

22.     Venue is proper in this judicial district pursuant to the forum selection clause contained in the Vendor Agreement with TimePayment, 28 U.S.C. § 1391(b)(2), and 18 U.S.C. § 1965.

## STATEMENT OF FACTS

### TIMEPAYMENT'S TYPICAL LEASE ARRANGEMENT

23.     TimePayment offers lease financing to businesses seeking commercial equipment.

24.     TimePayment enters into agreements with companies that sell or provide such equipment to business customers ("Vendors"). It entered into such an agreement with Advanced. *See* Exh. A. The process works as follows.

25.     A Vendor identifies a customer in need of financing for the equipment the Vendor sells and submits an application for lease credit to TimePayment on that customer's behalf or provides the customer with the contact information to submit their own application.

26.     Per its agreements with TimePayment, a Vendor like Advanced makes several warranties concerning the applications and other materials it submits to TimePayment. These include:

- That the lease is properly signed by the authorized party for the entity who will be bound by the lease (i.e., the Lessee);

- That the signatory has the authority to bind the Lessee to the lease;

- That the Vendor has not loaned, rebated, or advanced to the Lessee any of the funds necessary to commence the lease;

- That the Lease accurately reflects the equipment subject to the lease and that Vendor is transferring marketable title of the equipment to TimePayment;

- That the Vendor will not participate in or exert influence over TimePayment's telephone verification efforts (i.e., due diligence) with the Lessee and Vendor has not agreed to any modification of the lease terms;

- That the Vendor has not made any promises or representations to the lease that are not contained in, or that contradict, the terms of the lease; and

- That the transaction is free of fraud, forgery, or misrepresentation.

*See* Exh. A, ¶ 4.

27.     TimePayment also enters into a Progress Payment Agreement with some Vendors. Indeed, it entered into one with Advanced. *See* Progress Payment Agreement, attached as **Exhibit B**. Vendors like Advanced made additional representations and warranties in the Progress Payment Agreement as well, including among other things:

- That the Vendor has not made any promises or representations not contained in, or contrary to the terms of the Lease;

- That the transaction is "absent fraud, forgery, or misrepresentation";

- That the Vendor has not loaned, rebated, or advanced any funds required to commence the Lease to the Lessee;

- That the Vendor has good and marketable title to the equipment subject to the Lease and that TimePayment will hold such title following the Vendor's transfer of the equipment.

*See* Exh. B, at ¶ 5.

28.     If TimePayment approves the lease, the Vendor is responsible for arranging the customer's signature on the lease and perhaps most importantly, providing the customer's bank account information on a method of payment form. That bank account becomes the payment source from which TimePayment will draw monthly lease payments. The Vendor also submits an invoice for the equipment subject to the lease. TimePayment pays that invoice and takes title to the equipment subject to the lease.

29.     Once TimePayment approves the lease and takes title to the equipment, the lease becomes a non-cancellable, binding lease agreement between it and the Vendor's customer (i.e., the Lessee) under Article 2A of the Uniform Commercial Code.

30.     Thereafter, TimePayment collects monthly lease payments from the Lessee through ACH withdrawals from the bank account (i.e., the payment source) that the Vendor provided for the Lessee.

31.     This is a mutually beneficial arrangement for the Vendor, TimePayment, and the Lessee. TimePayment assumes the risk of non-payment on the lease and purchases the equipment from the Vendor. Because TimePayment offers financing for the Vendor's customers, the Vendor can expand the pool of customers for its equipment. In turn, more Lessees can secure the equipment they need for their businesses. Finally, TimePayment receives the benefit of the monthly payments from the Lessee.

32.    The chart below summarizes the typical lease origination transaction between TimePayment, a Vendor, and a Lessee:



33.    Generally, the Vendor is the point of contact with the customer and controls the flow of the information from that customer to TimePayment. TimePayment then uses that information to assess the lease application for that customer. Thus, TimePayment relies on the representations and truthfulness of its Vendors.

34.    TimePayment secures representations and warranties from its Vendors to provide accurate information about potential Lessees (as discussed above) and the equipment subject to the potential lease.

### THE RICO ENTERPRISE: ITS MEMBERS AND THEIR COMMON GOALS

35.    Advanced is a merchant service company that provides point-of-sale payment processors, ATMs, and similar equipment to various types of businesses across the country. At all times relevant to this Complaint, Isla served as Advanced's President.

36.    Between 2018 and September 27, 2024, Isla also served as the owner, managing member, and registered agent for Islands Enterprises.

37.    In 2022, Isla approached TimePayment about signing a Vendor Agreement between Advanced and TimePayment. The parties did so on October 14, 2022. Exh. A. By signing the Vendor Agreement, Isla bound Advanced (his alter ego) to the representations and warranties in that Agreement. *Id*., at ¶ 4.

38.    The parties subsequently executed a supplemental Progress Payment Agreement on October 24, 2022, that detailed how certain payments would be made under the Vendor Agreement. *See* Exh. B. By signing the Progress Payment Agreement, Isla bound Advanced (his alter ego) to the representations and warranties therein. *Id*., at ¶ 5.

39.    Between November 2022 and May 2024, Advanced submitted, and TimePayment approved 392 leases for Advanced's customers.

40.    However, as described more below, TimePayment's pre-suit investigation has concluded that at least 80% of those leases (314 of 392) were obtained and/or maintained by fraud and other illegal acts perpetrated by Isla, Advanced, and Islands Enterprises. As such, they also violated Advanced's obligations under the Vendor and Progress Payment Agreements.

41.    While these three Defendants were distinct, they associated to conduct a pattern of racketeering activity aimed at achieving several common goals.

42.    **Acquire Customers' Personal and Bank Account Information:** The RICO Enterprise, through Isla as its point man, deceived customers with various misrepresentations about the use of Advanced's commercial equipment in order to obtain the customers' personal information (including bank account information) necessary to submit leases to TimePayment.

43.    **Submit Fraudulent Leases and Invoices to TimePayment:** The RICO Enterprise, through fraudulent lease applications, leases, and equipment invoices drafted by Isla and submitted by Advanced, originated at least 314 fraudulent leases for Advanced's customers.

44.    **Maximize Equipment Payments from TimePayment:** By increasing the number of leases it originated, Advanced increased the amount of equipment payments it received from TimePayment. It received over $2.5 million in equipment payments from TimePayment for the 392 leases it originated between November 2022 and May 2024. TimePayment has now determined that **at least** 314 of those leases (representing at least $2,120,808.33 in equipment payments from TimePayment) were the product of fraud.

45.    **Conceal the Enterprise's Illegal Acts and Launder Illicit Profits Through a Bank Account Shell Game:** The RICO Enterprise—through Isla as the mastermind and with the help of his associated entities Advanced and Islands Enterprises—acted to conceal its fraud by executing the bank account shell game described below. The point of this shell game was to help maximize the number of leases Advanced could originate, limit the risk that someone would discover the fraud, and hide the proceeds of the illegal Enterprise.

46.    **Silence Victims Through Hush Money Payments:** The RICO Enterprise, directed by Isla and through Islands Enterprises and possibly others, used the illicit profits to pay off victims of the fraudulent leases in order to keep them quiet.

## THE RICO ENTERPRISE'S ILLEGAL ACTS

### MISREPRESENTATIONS, FRAUDULENT LEASES, AND HUSH MONEY PAYMENTS

47.    During the relevant time period, Isla was the President of Advanced and the managing member of Islands Enterprises. He used his position at both entities to draw them into the RICO Enterprise.

48.    Isla interacted with business owners and sought to solicit them to use Advanced's equipment in their businesses.

49.     Unbeknownst to TimePayment at the time, Isla made various false representations to Advanced's customers to obtain their personal and bank account information—which he needed to complete the lease materials that Advanced would submit to TimePayment.

50.     TimePayment became aware of these misrepresentations slowly as businesses began filing fraud complaints, claiming that TimePayment was charging them for leases they had never agreed to.

51.     Through fielding those complaints and speaking with customers, TimePayment learned that Isla offered a panoply of lies to induce businesses into handing over their information (particularly their bank account information) to Advanced. Isla made the misrepresentations below to multiple businesses between November 2022 and May 2024.

52.     He told some customers that Advanced's equipment was free and offered to pay them to place it in their stores. This was not charity. It was a ploy to get the customers' information. Isla used that information to fill out fraudulent lease materials for Advanced to send to TimePayment. These customers were unaware that Advanced had submitted leases on their behalf. They were understandably confused when TimePayment began withdrawing money from their bank accounts to cover monthly payments for leases the customers were completely unaware of.

53.     In other cases, Isla revealed that the customers would lease Advanced's equipment through a lease with TimePayment. However, on numerous occasions, Advanced submitted multiple leases for customers who had not agreed to be bound by multiple leases.

54.     In other instances, Isla failed to deliver the equipment subject to the lease. In still others, he promised the customer one piece of equipment but caused Advanced to invoice TimePayment for a different piece of equipment. Upon information and belief, this was to secure payment for equipment that was not on TimePayment's approved list. In other words, Isla would

promise a customer delivery of equipment he knew was not on TimePayment's approved list, but Advanced would invoice TimePayment for equipment that was in order to secure the lease and the equipment payment.

55.     Slowly, businesses began complaining to TimePayment when TimePayment withdrew monthly lease payments from their accounts.

56.     Some had no idea they were bound by any lease at all.

57.     Others were shocked to learn that Advanced had submitted multiple (unauthorized) leases in their name.

58.     Others denied signing a lease and said that the leases Advanced submitted on their behalf were forged.

59.     Still others learned that their bank accounts were listed as the payment source on leases for other (unrelated) businesses.

60.     By February 2025, TimePayment had charged off nearly 15% of the leases originated by Advanced, some of which were due to the fraud complaints mentioned above.

61.     In February 2025, TimePayment discovered that 71% of those leases were 30 days or more overdue. Most of the bank accounts listed as the payment source on those leases report insufficient funds. This delinquency figure is drastically above TimePayment's average delinquency rate of 15%. This triggered an internal investigation into all 392 Leases Advanced originated between November 2022 and May 2024.

62.     TimePayment reviewed each lease application and lease, consulted any communications it had received from the Lessees or Advanced, examined bank accounts listed on each lease, and analyzed payment history from the bank accounts listed as the payment source for

the lease to identify any suspicious trends, such as whether delinquencies were coordinated between bank accounts listed on multiple leases.

63.    TimePayment also utilized a financial verification system to authenticate the creditworthiness and legitimacy of bank accounts listed as the payment source on the 392 leases originated by Advanced.[1]

64.    That software conducts a two-pronged analysis, assessing (1) whether the bank account listed as the payment source on a Lease Application is associated with the Lessee named on the Lease; and (2) whether the bank account is valid and properly funded. The results were striking.

65.    297 of the 392 Leases originated by Advanced (over 75%) either failed or were flagged as a risk to fail at least one of the two search criteria. Put another way, less than a quarter of the Leases passed both tests.

66.    TimePayment then analyzed whether any of the 392 leases originated by Advanced listed a bank account associated with Isla, Advanced, or Islands Enterprises—an entity TimePayment had only recently discovered was associated with Isla. Again, the results were shocking.

67.    99 of the 392 Leases originated by Advanced (25%) listed a bank account tied to Island Enterprises. In short, over a quarter of all leases that Isla submitted to TimePayment listed a bank account that he, not the Lessee, controlled. We discuss this in more detail below.

68.    Through its pre-suit investigation, TimePayment has concluded that at least 314 of the 392 leases originated by Advanced (80%) are fraudulent in one or more of the following ways.

---

[1] TimePayment uses this software as part of its suite of tools in conducting due diligence efforts on bank accounts that Vendors submit for their own payment.

69. **The Lease was Procured by Fraud, Forgery, and/or Misrepresentation:** Many of the 314 leases were procured by fraud, forgery, or a material misrepresentation made by Isla to the business owner.[2]

70. **The Lease Lists a Bank Account That Is Listed as the Payment Source on Leases for Other Unrelated Businesses:** Many of the 314 fraudulent leases listed a bank account as a payment source that is also listed on other leases for other unrelated businesses. As discussed more below, this was part of the bank account shell game that the RICO Enterprise used to perpetrate and conceal its fraud. In some instances, the bank accounts belonged to other victim businesses. On other occasions, the bank accounts actually belonged to Islands Enterprises. On still other occasions, the bank accounts appear to be associated with, or otherwise controlled by, the members of the RICO Enterprise.

71. **The Lease Lists a Bank Account that Failed the Software Analysis:** Several leases listed a bank account that—while not used on other leases for other businesses—was not associated with the business named on the lease.

72. **The Lease is for a Business Bound by Multiple Unauthorized Leases:** Several more leases were for businesses that were bound by more than one lease and did not agree to be so bound.

73. The software data revealed the scope and pattern of fraud perpetrated by the RICO Enterprise and, in particular, their complicated use of bank accounts to perpetrate their illegal acts.

---

[2] TimePayment learned about these misrepresentations from the business owners themselves when they made fraud complaints to TimePayment.

## THE BANK ACCOUNT SHELL GAME

74.     The 392 leases Advanced originated listed 498 different bank accounts as payment sources. While some of those accounts were legitimately tied to a Lessee, many were not. Even for those that were legitimate, the RICO Enterprise used some of them in illegal ways.

75.     The RICO Enterprise—led by Isla and assisted by Advanced and Islands Enterprises—utilized both legitimate and illegitimate bank accounts to create a complex shell game, the goal of which was to conceal their illegal activities and allow them to continue those activities unabated.

76.     For example, Advanced listed a small universe of bank accounts as the payment source on numerous leases for different businesses. This allowed Advanced to secure multiple leases for multiple businesses but cause a smaller number of other businesses to incur the monthly lease charges.

77.     For example, Advanced originated 8 leases for one business, a beauty salon in West Palm Beach. The business owner was not aware of any of those leases for some time. She later told TimePayment that Isla had told her that Advanced would pay her business to use Advanced's equipment. However, Advanced submitted multiple unauthorized leases to TimePayment on the salon's behalf. It listed the same bank account as the payment source on all eight leases: a Bank of America ("BoA") account ending in -2946.

78.     Eventually the salon owner uncovered the fraud and spoke with TimePayment. When TimePayment told her about the BoA account listed on the 8 leases, she informed TimePayment that the salon did not even have a bank account with BoA. Not only had Advanced submitted numerous unauthorized leases on the salon's behalf, but it had listed a bank account on

those leases that was not owned by the salon. This was not an anomaly. It was part of the RICO Enterprise's pattern to commission and conceal its fraud.

79.     Indeed, TimePayment discovered that the salon was not the only business that Advanced tied to that same BoA account. Advanced listed that account as the payment source on 20 leases for 3 apparently unaffiliated entities.

80.     Advanced repeated this pattern with numerous bank accounts and businesses. We provide only a few illustrative examples below.

81.     It listed another BoA account ending in -4199 as the payment source on 25 Leases for 6 apparently unrelated entities.

82.     It listed another BoA account ending in -7042 as the payment source on 22 leases for 3 apparently unrelated entities.

83.     It listed another BoA account ending in -9659 as the payment source on 13 leases for 3 apparently unrelated entities.

84.     It listed another BoA account ending in -8489 as the payment source on 12 Leases for 3 apparently unrelated entities.

85.     It listed another BoA account ending in -6343 as the payment source on 9 leases for 5 apparently unrelated businesses.

86.     It did the same with a Regions Bank account ending in -2140. It listed that bank account as the payment source on 5 leases for 3 apparently unrelated entities.

87.     Again, these are just a few illustrative examples. TimePayment identifies all of the known bank accounts involved in the RICO Enterprise's bank shell game in the next section below.

88.     Upon information and belief, this shell game was part of a strategy. TimePayment withdrew these lease payments on a monthly basis. They were also relatively small, with the

average monthly payment being $170.73. Therefore, these withdrawals may go unnoticed for some time on even a diligent business owner's account. Any such delay afforded time for Advanced to collect the lump sum equipment payment from TimePayment for the equipment subject to the lease before anyone discovered the fraud.

89.    Isla and Advanced compounded the delay by regularly listing incorrect contact information for the Lessees on many of the leases. Thus, if a lease went into delinquency and TimePayment wanted to contact the Lessee listed on the lease, it might have trouble reaching the right person. This further delay gave Advanced time to collect the equipment payments before anyone discovered the fraud.

90.    Still, listing bank accounts for one business on leases for another ran the risk that someone would discover the fraud and blow the whistle. To avoid this, Isla and Advanced began to list bank accounts for entities under Isla's control as the payment source on the lease applications for Advanced's customers. One such entity was Islands Enterprises.

91.    Beginning in 2023 and increasing through May 2024, Advanced listed accounts associated with Isla's entity, Islands Enterprises, as the payment source on leases for Advanced's customers. As with its other fraudulent lease applications, Advanced falsely passed these Islands Enterprises accounts off as being associated with the business named on the lease.[3]

92.    Advanced originated the first Lease listing an Islands Enterprises bank account in April 2023. It originated two more in May and July 2023, respectively.

---

[3] During this period, TimePayment was still unaware of Islands Enterprises, let alone its connection to Isla.

93.    Upon information and belief, these were trial balloons to see if the Islands Enterprises accounts would get flagged as fraudulent. Once it was clear they would not, the RICO Enterprise shifted to using those accounts as a payment source on its fraudulent leases in earnest.

94.    Between October 2023 and May 2024, Advanced originated at least 96 Leases that listed an Islands Enterprises bank account as a payment source.

95.    Upon information and belief, the RICO Enterprise—with Isla as its mastermind and Advanced and Islands Enterprises following his direction—deliberately made this shift to further conceal its illegal acts.

96.    Upon information and belief, the members of the RICO Enterprise realized that they could use Islands Enterprise to shield the Enterprise's activities from possible fraud complaints. Listing other businesses' bank accounts as the payment source on fraudulent leases ran the risk that those victims would discover the fraud and complain. If the RICO Enterprise could list the accounts of a pliant party that would make the small monthly Lease payments without complaint, it could continue the scheme unabated for the small price of the monthly lease payments. Enter Islands Enterprises—a member of the RICO Enterprise itself.

97.    Upon information and belief, the RICO Enterprise began listing Islands Enterprises' bank accounts on its fraudulent leases once it had obtained sufficient equipment payments from TimePayment to cover the small monthly lease payments for its fraudulent leases.

98.    Upon information and belief, the members of the RICO Enterprise determined that these small monthly lease payments were a worthwhile investment in the overall RICO Enterprise, because they insulated it from potential fraud complaints.

**THE ACCOUNTS IN THE SHELL GAME AND HOW THE RICO ENTERPRISE USED THEM**

99.    Based on its pre-suit investigation, TimePayment has identified 26 bank accounts ("Subject Accounts") that the RICO Enterprise utilized in some way to conduct or conceal its illegal acts through the bank account shell game. These Subject Accounts fall into four distinct sub-categories: "Advanced Accounts," "Islands Accounts," "Suspected Enterprise Accounts," and "Victim Accounts." Each of these sub-categories are described below.

100.    **Advanced Accounts (2 bank accounts):** These are two bank accounts that Advanced identified on the ACH Authorization forms it submitted to TimePayment when it signed on as one of Advanced's vendors. These accounts are tied directly to Advanced. They include:

- New York Community Bank account ending in -0306 ("NYCB-0306")

- Regions Bank account ending in -1407 ("RB-1407")

101.    Upon information and belief, the Advanced Accounts contain at least some of the proceeds of the RICO Enterprise's illegal acts.

102.    **Islands Accounts (6 bank accounts):** These are 6 Bank of America accounts tied to Islands Enterprises. As discussed above, in late 2023 and continuing into 2024, the RICO Enterprise began listing these Islands Accounts as the payment source for fraudulent leases it submitted to TimePayment. It submitted 99 such leases tied to 21 different customers between May 2024 and May 2024. The Islands Accounts include:

- BoA account ending in -1668 ("BoA-1668"): 14 leases with 6 customers

- BoA account ending in -4199 ("BoA-4199"): 25 leases with 6 customers

- BoA account ending in -4910 ("BoA-4910"): 12 leases with 2 customers

- BoA account ending in -4949 ("BoA-4949"): 13 leases with 1 customer

- BoA account ending in -7042 ("BoA-7042"): 22 leases with 3 customers

- BoA account ending in -7189 ("BoA-7189"): 13 leases with 3 customers

103.    Upon information and belief, Isla and/or Advanced transferred at least some of the RICO Enterprise's illegal acts to one or more of the Islands' Accounts.

104.    In addition to using the Islands Accounts as part of the bank account shell game, the RICO Enterprise also used Islands Enterprises to pay off the victims of the RICO Enterprise's illegal acts in the hopes of keeping them quiet.

105.    As noted above, when TimePayment began withdrawing money from their accounts, some of Advanced's customers contacted Isla complaining about fraud. Isla tried to mollify them with money. Several customers have averred to TimePayment that Isla paid them via the bank-to-bank transfer app, Zelle, for the amounts TimePayment withdrew from their accounts.

106.    Even at this early, pre-discovery stage of the case, TimePayment has an example of one such payment made from an Island Enterprises account to a complaining Advanced customer:[4]



_____

[4] The handwriting on this screenshot is from the customer who sent the screenshot to TimePayment in connection with his fraud complaint.

107.    Upon information and belief, Islands Enterprises has made other such Zelle payments from one or more of the 6 Islands Accounts listed above using the proceeds from the RICO Enterprise's illegal actions.

108.    **Suspected Enterprise Accounts (13 bank accounts):** These include 10 accounts with Bank of America and 3 accounts with Regions Bank. Advanced listed these accounts as the payment source on at least 102 leases for 38 different customers. The verification software described above concluded that these accounts are not tied to any of those customers. Like the Islands Accounts, Advanced spread these bank accounts across leases for multiple, seemingly unrelated businesses.

109.    Given that the RICO Enterprise used the bank accounts in this manner and the accounts are not associated with the customers named on the leases on which they appear, TimePayment reasonably believes that these Suspected Enterprise Accounts are associated with or controlled by the RICO Enterprise.

110.    The Suspected Enterprise Accounts include:

- BoA account ending in -2360 ("BoA-2360 "): 5 leases with 4 customers

- BoA account ending in -2464 ("BoA-2464"): 5 leases with 2 customers

- BoA account ending in -2946 ("BoA-2946"): 20 leases with 3 customers

- BoA account ending in -3290 ("BoA-3290"): 3 leases with 3 customers

- BoA account ending in -4381 ("BoA-4381"): 2 leases with 2 customers

- BoA account ending in -4404 ("BoA-4404"): 6 leases with 2 customers

- BoA account ending in -6343 ("BoA-6343"): 9 leases with 5 customers

- BoA account ending in -6862 ("BoA-6862"): 4 leases with 2 customers

- BoA account ending in -8489 ("BoA-8489 "): 12 leases with 3 customers

- BoA account ending in -9659 ("BoA-9659"): 13 leases with 3 customers

- Regions Bank account ending in -1350 ("RB-1350"): 11 leases with 2 customers

- Regions Bank account ending in -2140 ("RB-2140"): 5 leases with 3 customers

- Regions Bank account ending in -2159 ("RB-2159"): 7 leases with 4 customers

111.    Upon information and belief, at least some of the proceeds from the RICO Enterprise's illegal acts are in one or more of the Suspected Enterprise Accounts.

112.    **Victim Accounts (5 bank accounts):** These are five bank accounts that TimePayment was able to link, through canceled checks, to one of the Lessees listed on a lease originated by Advanced. However, as part of their illegal acts, Isla drafted and Advanced submitted Lease Applications listing these accounts as the payment source for businesses other than the business that owned these accounts. The Victim Accounts include:

- JP Morgan Chase account ending in -5879 ("JP-5879"): 4 leases with 2 customers

- TD Bank account ending in -0275 ("TD-0275"): 3 leases with 2 customers

- TD Bank account ending in -2343 ("TD-2343"): 2 leases with 2 customers

- Truist account ending in -6843 ("Truist-6843"): 2 leases with 2 customers

- BoA account ending in -7205 ("BoA-7205"): 5 leases with 2 customers

113.    In summary, the RICO Enterprise used the Islands Accounts, Suspected Enterprise Accounts, and the Victim Accounts to create a tangled web of payment sources spread across hundreds of leases and dozens of unrelated Lessees.

114.    The point was to maximize the number of leases to and equipment payments from TimePayment while minimizing the risk that someone would uncover the fraud.

115.    When it became tenable to do so, the RICO Enterprise took a greater level of control by listing its own accounts as the payment source on the fraudulent leases Advanced submitted to

TimePayment. The small monthly lease payments were a small price to pay for mitigating the risk that some Advanced customers whose account was listed on a fraudulent lease would uncover the fraud and complain.

116.    The RICO Enterprise used Islands Enterprises' accounts, and potentially others, to silence the customers by making hush payments through the bank-to-bank transfer app Zelle to cover whatever TimePayment removed from their accounts.

117.    This evolving criminal scheme worked long enough to allow Advanced to extract at least $2,120,808.33 in equipment payments from TimePayment on at least 314 fraudulent leases.

### THE PREDICATE ACTS SUPPORTING THE RICO ENTERPRISE

118.    The RICO Enterprise engaged in and profited from the following illegal predicate acts under Federal law.

### PREDICATE ACTS UNDER FEDERAL LAW

119.    **Mail Fraud (18 U.S.C. § 1341):** Isla and Advanced knowingly submitted to TimePayment leases which were procured by fraud or misrepresentations, contained false information, or were forged. It did so to obtain equipment payments from TimePayment on false pretenses.

120.    They aimed to defraud TimePayment and succeeded in many instances. Indeed, TimePayment's investigation has uncovered well over 180 leases that fall into this category of fraud.

121.    Isla and Advanced used interstate mail to transmit those fraudulent lease applications and leases across state lines to TimePayment in Massachusetts.

122.     TimePayment has identified at least 241 Advanced-originated leases for which the Lessee never received the equipment subject to the lease or received different equipment than the equipment listed on the lease.

123.     Isla and Advanced also used interstate mail to transmit the invoices for the equipment subject to those leases to TimePayment.

124.     The false information contained in the lease applications, leases, and equipment invoices was clearly material to TimePayment's decision to approve the leases and render the equipment payments to Advanced.

125.     **<u>Wire Fraud (18 U.S.C. § 1343):</u>** The RICO Enterprise committed wire fraud by using interstate wires to facilitate and conceal its fraudulent scheme.

126.     Advanced received at least $2.5 million in equipment payments in Florida from TimePayment in Massachusetts, by interstate wires between November 2022 and May 2024.

127.     At least $2,120,808.33 of those payments were tied to 314 fraudulent leases that Advanced submitted to TimePayment. Those payments were procured by the acts of mail fraud described above.

128.     Upon information and belief, Isla directed Advanced to send some or all of those illegally obtained funds to Islands Enterprises, and potentially other related entities, by interstate wires.

129.     Upon information and belief, Islands Enterprises received the ill-gotten funds as part of a common scheme to hide the funds from TimePayment or others who may seek to recover them.

130.    At Isla's direction, Islands Enterprises used interstate wires to transfer funds to victims of the scheme who raised concerns to Isla. It did so to mollify those victims and keep them from complaining to TimePayment or legal authorities about the fraud.

131.    Indeed, one customer from Brooklyn, New York, told TimePayment that he had complained to Isla when he discovered that Advanced had bound him to a lease with TimePayment. Isla began sending the customer monthly Zelle payments (across state lines) to cover the monthly lease payments—ostensibly to keep the customer from complaining.

132.    Upon information and belief, some or all of the funds Islands Enterprises used to make these and other hush payments were those Advanced received from TimePayment and transferred to Islands Enterprises.

133.    In short, Islands Enterprises used interstate wires and illegally obtained funds to cover up and continue the RICO Enterprise's illegal activities.

134.    **Money Laundering (18 U.S.C. § 1956):** The RICO Enterprise also committed money laundering in furtherance of and to conceal the leasing scheme.

135.    First, upon information and belief, Isla directed Advanced to transfer some or all of the ill-gotten proceeds of its illegal activity to Islands Enterprises—an entity about which TimePayment was unaware at the time.

136.    Isla did this to conceal the funds from TimePayment and others and to continue the leasing scheme.

137.    Second, upon information and belief, the RICO Enterprise used the proceeds of its illicit acts to pay off victims of the scheme in the hope of keeping them quiet and allowing the scheme to continue unabated. It made some or all of these payments through Zelle transfers from Islands Enterprises and potentially other entities' accounts.

138.     Third, upon information and belief, the RICO Enterprise filled the Islands Accounts with the proceeds of the RICO Enterprise's illegal acts, listed them as payment sources on fraudulent leases, and then used those funds to cover lease payments, as alleged above.

139.     Upon information and belief, the RICO Enterprise shifted from listing third party bank accounts (such as the Victim Accounts) to the Islands Accounts to reduce the risk of fraud complaints and with the intent to carry on with the unlawful leasing scheme.

### THE RESULTS OF THE RICO ENTERPRISE

140.     Between November 2022 and May 2024, Advanced originated 392 leases with 190 customers.

141.     To date, TimePayment has paid Advanced at least $2.5 million in connection with those leases.

142.     As of the date of this Complaint, TimePayment has discovered that at least 314 of those 392 leases (80%) were procured by fraud. Those leases are tied to over 100 victims across 9 states.

143.     TimePayment paid Advanced at least $2,120,808.33 for the equipment subject to those 314 fraudulent leases.

144.     As of February 28, 2025, 71% of the leases originated by Advanced are 30 days past due or more—significantly higher than TimePayment's average delinquency rate of 15%.

145.     TimePayment has already charged-off 65 leases, resulting in a loss of $266,229.00 in expected future lease payments.

**COUNT I**
**Violation of 18 U.S.C. § 1962(c)**
**(Against Isla, Advanced, and Islands Enterprises)**

146.    TimePayment incorporates by reference all of the allegations above as if each were set forth fully below.

147.    The RICO Enterprise consists of Isla, Advanced, and Islands Enterprises.

148.    The members of the RICO Enterprise are distinct from one another, but associated to carry out a common goals of : (1) acquiring customers' personal and bank account information through fraud and misrepresentations; (2) submitting fraudulent leases to TimePayment; (3) maximizing the equipment payments from TimePayment through the fraudulent leases; (4) concealing the RICO Enterprise's illegal acts and illicit profits through the bank account shell game; and (5) silencing victims through hush money payments.

149.    As set forth above, the RICO Enterprise achieved these goals through a pattern of mail fraud, wire fraud, and money laundering (in violation of 18 U.S.C. §§ 1341, 1343, and 1956, respectively) between November 2022 and at least May 2024, if not longer.

150.    Each of the members of the RICO Enterprise participated in its illegal activities as alleged above.

151.    All of the members of the RICO Enterprise violated 18 U.S.C. § 1962(c), by engaging in the aforementioned pattern of racketeering activity.

152.    This pattern of racketeering activity occurred in and affected interstate commerce.

153.    First, the customers victimized by the RICO Enterprise resided in Massachusetts, Delaware, Florida, Indiana, Maryland, New Jersey, New York, Ohio, and Pennsylvania.

154.    Second, the RICO Enterprise transmitted fraudulent and/or forged lease applications, leases, and equipment invoices through interstate mail to TimePayment in Massachusetts.

155.    Third, the RICO Enterprise received its illicit profits, procured by the mail fraud described above, through interstate wires from TimePayment in Massachusetts.

156.    Fourth, upon information and belief, the RICO Enterprise made one or more interstate wire transfers of hush money using the illegal proceeds and with the intent of continuing the Enterprise's illegal activities.

157.    Finally, the RICO Enterprise's illegal actions caused, and are continuing to cause, harm to TimePayment in Massachusetts.

158.    Isla, Advanced, and Islands Enterprises collected illicit income and profits from their pattern of racketeering activity. They used those profits to enrich Isla and the entities, re-invest in the entities perpetrating the scheme, and pay off victims of the scheme to prevent its discovery.

159.    TimePayment suffered direct and proximate harm from the RICO Enterprise's acts and the violations of 18 U.S.C. § 1962(c) alleged above.

160.    Specifically, in reliance on Advanced's misrepresentations in the lease applications, TimePayment has paid Advanced over $2.5 million for the 392 leases Advanced originated between November 2022 and May 2024.

161.    Of the 392 leases Advanced originated, 320 remain active. As of February 28, 2025, 71% of those Leases are 30 days or more past due or more.

162.    Prior to filing this Complaint, TimePayment was forced to charge off 72 leases, resulting in a loss of $266,229.00.

163.    As of today's date, TimePayment has concluded that at least 314 of the 392 leases originated by Advanced—representing at least $2,120,808.33 in payments from TimePayment to Advanced for the equipment subject to those leases—are fraudulent.

164.    TimePayment has suffered at least $2,120,808.33 in damages from the RICO violations described above.

WHEREFORE, TimePayment requests that this Court enter judgment against Isla, Advanced, and Islands Enterprises for damages of not less than $2,120,808.33, treble damages of not less than $6,362,424.99, and attorney's fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT II
### Violation of 18 U.S.C. § 1962(d)
### (Against Isla, Advanced, and Islands Enterprises)

165.    TimePayment incorporates by reference all of the allegations above as if each were set forth fully below.

166.    The members of the RICO Enterprise combined to accomplish the common goals alleged above through the pattern of racketeering activity identified above.

167.    As alleged above, the members of the RICO Enterprise engaged in that pattern of racketeering activity between November 2022 and at least May 2024, through the predicate acts of mail fraud, wire fraud, and money laundering.

168.    Each of the members of the RICO Enterprise knew that their predicate acts were an essential part of the racketeering activity supporting their common leasing scheme.

169.    Each of the members of the RICO Enterprise agreed to commission those predicate acts to further the common aims of their leasing scheme.

170.    Accordingly, the members of the RICO Enterprise violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

171.    As set forth in detail above, TimePayment suffered direct and proximate harm to its business as a result of the RICO Enterprise's overt acts in support of the conspiracy.

WHEREFORE, TimePayment requests that this Court enter judgment against Isla, Advanced, and Islands Enterprises (the members of the § 1962(d) conspiracy) for damages of not less than $2,120,808.33, treble damages of not less than $6,362,424.99, and attorney's fees, pursuant to 18 U.S.C. § 1964(c).

**COUNT III**
**Breach of Contract – Vendor and Progress Payments Agreements**
**(Against Isla and Advanced)**

172.    TimePayment incorporates by reference all of the allegations above as if each were set forth fully below.

173.    Advanced and TimePayment entered into a Vendor Agreement on October 14, 2022. *See* Exh. A.

174.    The parties subsequently executed a supplemental Vendor Progress Payment Agreement on October 24, 2022. *See* Exh. B.

175.    Defendant Isla operated Advanced as an alter ego of himself and was a signatory to both Agreements in his personal capacity, as well.

176.    The Agreements contain a forum selection clause stating that all parties consent, and thereby waive any objection, to the jurisdiction of the Commonwealth of Massachusetts and agree that any action arising out of the agreements shall be brought in the venue of Massachusetts. *See* Exh. A, ¶ 23; Exh. B, ¶ 10.

177.    These agreements described certain rights and obligations that each party had in the context of its business relationship. As described in greater detail above, TimePayment would

submit payments to Advanced for certain commercial equipment and thereby obtain the right to lease payments from customers for said equipment.

178.    Advanced made various representations and warranties in both Agreements concerning the application materials, leases, and equipment invoices that it submitted to TimePayment. *See* Exh. A, at ¶ 4; Exh. B, at ¶ 5.

179.    If Advanced breaches the Vendor Agreement, TimePayment has the right to charge Advanced back for all amounts owed under a Lease, and any damages or reasonable expenses it may incur due to the violation. *Id.*, at ¶ 10.

180.    Specifically, the Vendor Agreement permits TimePayment to charge back Advanced  "for all amounts owed under the Lease, damages and/or reasonable expenses it may incur for [Advanced's] violations of this Agreement, for any claim by the Lessee or Guarantor of misrepresentation, fraud, or forgery which [TimePayment] determines is valid[.]" *Id.*

181.    Under the Progress Payment Agreement, if Advanced is in default or TimePayment is forced to cancel a Lease Advanced originated, TimePayment may demand "the aggregate amount of all Progress Payments made by [TimePayment] to [Advanced] in connection with a Transaction and Lease, together with interest" as set forth in the Agreement. Exh. B, at ¶ 7. Alternatively, TimePayment can initiate debit entries against the Advanced checking account on file to "reimburs[e] [TimePayment] for any and all amounts due" under the Progress Payment Agreement.  *Id.* The Progress Payment Agreement also permits TimePayment to charge certain late fees, attorney's fees, court costs, and other expenses caused by Advanced's default. *Id.*

182.    Advanced breached the contract between the parties by violating representations and warranties it made to TimePayment in both the Vendor and Progress Payments Agreements, with regard to at least 314 Leases.

183.    As alleged above, those  Leases were procured via fraud, misrepresentation, or forgery, and/or were not properly signed by an authorized party. This clearly violated the representations and warranties in both Agreements. *See* Exh. A, at ¶ 4; Exh. B, at ¶ 5.

184.    Additionally, as alleged above, Advanced provided false and fraudulent information to TimePayment in connection with the Leases and  submitted false and fraudulent equipment invoices to wrongfully obtain progress payments from TimePayment. These actions also violated the representations and warranties in both Agreements. *Id*.

185.    Further still, as alleged above, Advanced and Isla made representations and promises to Lessees that were inconsistent with the terms of the Leases and advanced funds to Lessees to cover Lease payments. These actions also violated the representations and warranties in both Agreements. *Id*.

186.    On April 7, 2025, TimePayment notified Advanced of its breaches and exercised its  right under the Vendor Agreement to charge Advanced back for $2,120,808.33 for amounts due under Leases Advanced submitted.

187.    To date, neither Advanced nor Mr. Isla have paid that sum to TimePayment in accordance with the provisions of the Agreement.

188.    Additionally, TimePayment has attempted to debit Advanced's accounts as permitted under the Progress Payment Agreement with respect to certain other Leases already in default. *See* Exh. B, at ¶ 7. Those accounts have reported "insufficient funds." In short, Advanced has moved money out of these accounts to thwart TimePayment's bargained-for contractual remedies for Advanced's breach.

189.    TimePayment has been damaged by Defendants' actions as a result of the breach of the terms of the Agreement and ensuing refusal to pay sums demanded.

WHEREFORE, TimePayment claims monetary damages in the amount of at least $2,120,808.33; consequential damages; all interest due and owing under the Agreement; late fees due and owing under the Agreement; attorneys' fees, costs of collection, and other Losses as that term is defined in the Agreement (*see* Exh. A, at ¶ ; Exh. B, at ¶ 7); and other such relief as the Court may deem equitable and necessary.

### COUNT IV
### Unjust Enrichment (in the Alternative)
### (Against Isla and Advanced)

190.    TimePayment incorporates by reference all of the allegations above as if each were set forth fully below.

191.    Between November 2022 and May 2024, TimePayment conferred a benefit on Advanced and Isla in the form of payments of at least $2.5 million, representing the cost of the equipment it purchased from Advanced and then leased to Advanced's customers.

192.    Advanced and Isla understood that TimePayment made these payments to Advanced based on the representations Advanced made in the lease materials and equipment invoices it submitted to TimePayment.

193.    Advanced and Isla further understood that TimePayment intended to collect monthly lease payments from Advanced's customers (i.e., Lessees).

194.    Advanced and Isla accepted the benefit of TimePayment's payments based on these understandings.

195.    Yet, Advanced and Isla knew that at least 314 of the leases it submitted to TimePayment, and many of the equipment invoices, were fraudulent.

196.    Some customers discovered the fraud and stopped paying TimePayment on their leases.

197.    Other Leases were tied to bank accounts that, by 2024, were registering insufficient funds.

198.    Advanced and Isla retained the benefit of TimePayment's payment for the Leases, while intentionally undermining the basis upon which TimePayment conferred that benefit and depriving TimePayment of the lease payments it expected to receive from the arrangement.

199.    TimePayment has determined that at least 314 of the leases originated by Advanced—representing at least $2,120,808.33 in equipment payments—are the product of fraud.

200.    Accordingly, it would be unjust to allow Advanced and Isla to retain the benefit of these payments and would only serve to reward it for its fraud.

WHEREFORE, TimePayment requests that this Court enter judgment against Advanced and Isla for not less than $2,120,808.33.

### PRAYER FOR RELIEF

WHEREFORE, TimePayment respectfully requests that the Court enter judgment against the Defendants as follows:

1.    An Order awarding TimePayment the value of the damages it suffered as a result of the Defendants' RICO violations of not less than $2,120,808.33, with the exact amount to be determined at trial;

2.    An Order awarding TimePayment the trebled amount of the damages it suffered as a result of the Defendants' RICO violations of not less than $6,362,424.99, with the exact amount to be determined at trial;

3.    Disgorgement of the Defendants' ill-gotten gains from the RICO Enterprise;

4.    Under Count III, an Order awarding not less than $2,120,808.33; consequential damages; all interest due and owing under the Agreement; late fees due and owing under the

Agreement; attorneys' fees, costs of collection, and other Losses as that term is defined in the Agreement;

5.    Alternatively, under Count IV, an Order awarding TimePayment not less than $2,120,808.33 from Advanced to prevent unjust enrichment, with the exact amount to be determined at trial;

6.    An Order awarding TimePayment its attorney's fees pursuant to 18 U.S.C. § 1964(c); and

7.    Any other legal or equitable relief that this Court deems just and proper.


Dated: April 29, 2025                              Respectfully submitted,

                                                   TIMEPAYMENT CORP.

                                                   By Counsel

                                                   */s/  Andrew M. Schneiderman*
                                                   Andrew M. Schneiderman, Esq. (#666252)
                                                   O'HAGAN MEYER
                                                   140 Kendrick Street, Building C, 2nd Floor
                                                   Needham, MA 02494
                                                   Telephone:  (617) 843-6800
                                                   Facsimile:   (617) 843-6810
                                                   Email: ASchneiderman@ohaganmeyer.com


                                                   Charles K. Seyfarth (*pro hac application forthcoming*)
                                                   C. Quinn Adams (*pro hac application forthcoming*)
                                                   O'HAGAN MEYER
                                                   411 East Franklin Street, Suite 500
                                                   Richmond, Virginia 23219
                                                   Telephone: (804) 403-7137
                                                   Facsimile: (804) 403-7110
                                                   Email: CSeyfarth@ohaganmeyer.com
                                                   Email: CAdams@ohaganmeyer.com

                                                   *Counsel for TimePayment Corp.*